## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## <u>EASTERN DIVISION</u>

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ANTHONY LAMON FRAZIER,** | ) | **Case No. 1:21-cr-371-CLM-JHE** |
| *also known as* "**Tony**" | ) | |
| **and** | ) | |
| **FREDERICK ANDRE SPENCER** | ) | |

## <u>GOVERNMENT'S TRIAL BRIEF</u>

Comes now the United States, by and through its United States Attorney, and respectfully submits this Trial Brief to aid the Court in presiding over the upcoming trial of *United States v. Anthony Frazier, et.al.*

### I.    <u>Underlying Facts</u>

In January 2018, agents with the Bureau of Alcohol, Tobacco, and Firearms (ATF), in coordination with the Talladega County Drug Task Force (TCDTF), began an investigation into various drug trafficking networks in Talladega County. This investigation ultimately revealed that several individuals were working with and for Anthony Lamon Frazier as part of a drug trafficking and money laundering ring. The Internal Revenue Service (IRS) joined with ATF in 2020 to assist with the financial investigation.

1

Frazier was a Talladega County Tax Assessor during the period of investigation, but he was also engaged in several money-making enterprises on the "side," which constituted the bulk of his income for the years of investigation and are detailed below. He purported to own "FF Autos," a used car dealership which only has a single sign and a very small grassy area at its physical location. It appears that any car sales Frazier may have engaged in likely took place at and through "Scott and Sons," a different car repair shop in Talladega operated by Clevious Porter. Frazier also purported to own "Frazier Investments," which does business as "FF Autos" among other endeavors. He was also the sole owner of the business bank account for "Head of Game," a purported sports agency discussed in further detail below.

In 2019, Frazier delivered methamphetamine to a cooperating source during a controlled purchase conducted by ATF. Frazier was federally indicted in September 2020, and convicted at trial in November 2020, on a single count of Possession with Intent to Distribute Methamphetamine. He is currently serving a ten-year federal sentence in Talladega FCI. Around the time of his indictment, the United States seized two bank accounts connected to Frazier and believed to be used in laundering drug proceeds for Frazier and his co-conspirators. These PNC bank accounts were in the names of "Frazier Investments" and "Head of Game

Management," and Frazier maintained signatory authority on both accounts.

Contemporaneous with the beginning of this money laundering activity, Frazier and Fred Spencer, were engaged in fraudulently obtaining funds from a soon-to-be professional athlete, Q.W., under false pretenses.

The victim, Q.W., met Fred Spencer when he was a freshman in high school. Spencer is ten years older than Q.W. and functioned as a parental figure for Q.W. when his mother died in high school. Q.W. reconnected with Spencer in his junior year of college, as he prepared to declare for the NFL Draft and was going through the process of screening various sports agencies. During this time, Q.W. decided that he wanted to create his own sports agency and informed Spencer of his plan. Prior to the 2018 National Championship game, he told Spencer that he would need someone to help with marketing exposure and that he wanted to be signed to himself.

Q.W. screened several sporting agencies, but Young Money (Lil' Wayne's agency) was the only agency agreeable to his terms. He signed with Young Money and immediately began the process of starting his own agency, under the name "Head of Game" or "HOG." At the time of his signing, Q.W. was 19. Around this time, Spencer introduced Q.W. to Kelvin Dark, who Q.W. knew as "KDigga." Q.W. thought that having Dark assist with marketing would be helpful, since Dark

3

was a rapper with connections in the music industry. When Q.W. met with DARK, he pitched the name "Head of My Time," as he was 19 and already creating his own agency. However, Dark was already making use of the "HOG" moniker and Q.W. decided that it would be good to associate with that name.

On November 27, 2018, Frazier opened a bank account under the name "Head of Game," for which he retained sole signatory authority. One night in late November or early December 2018, Q.W., Dark, and Spencer went out to dinner in Atlanta to discuss the plan for HOG. At dinner, Dark provided Q.W. with a sheet of paper that contained handwritten details of the HOG bank account. Dark told Q.W. that this was their ("HOG's") bank account. The paper contained the handwritten names of all three individuals and handwritten bank account information including an account number. As part of their representation, Young Money had created a line of credit for Q.W., who was given a $1 million advance to cover personal expenses prior to signing an NFL contract. As a result of the conversation with Dark and Spencer, and their representations to him about how they would create and market a sports agency, Q.W. wired $500,000 of his advance to the HOG account on January 15, 2019, and the remaining $500,000 to his personal bank account. At the time of this wire, Q.W. did not know Frazier. On

January 16, 2019, Frazier wired $214,825 of Q.W.'s money from the "Head of Game" account to an account held by Charleen Porter, Frederick Spencer's mother.

Initially, the first month of operations went well from Q.W.'s perspective. He was sent sample merchandise for the agency, he observed marketing on social media outlets, and partnered with a Disney star for a public service announcement (PSA) on bullying. Q.W. did voiceover work for this PSA, but never saw it air on television as promised. At the time, Spencer was allegedly working on securing commercial space for HOG in Atlanta. Things changed when Q.W. moved back to Atlanta from California, which provided him with a first-hand perspective of daily operations. At that time, he discovered that the merchandise being mass-produced was of much lower quality than what he had been sent.

At the same time, Spencer and his team were in the process of selecting an agent for the sports agency. It was at this time that Q.W. met Anthony Frazier. He had a business dinner with Frazier, a marketing agent, a football agent, Spencer, and Dark. Frazier had not yet been hired to be the agent for HOG and was still in school retaining credentials to be a sports agent. Frazier was ultimately hired as the second football agent. Q.W. understood Dark and Frazier to be cousins. After that dinner, HOG only signed one player, "D.J.". Q.W. was growing frustrated, as he, at that point, did not believe he was receiving a return on his investment and was

5

losing money. Although Spencer and Dark told Q.W. that they had a realtor in Atlanta looking for commercial real estate, he saw no evidence that anyone was actually securing real property for HOG.

Q.W. logged in using Spencer's information a few times to monitor the account activity for the HOG bank account in January and February 2019. In July 2019, Dark was arrested on drug trafficking charges in Georgia, and Q.W. told his agent at Young Money that he wanted to be removed from all HOG social media accounts and to disassociate from Spencer and his friends. Spencer attempted to reach out to Q.W. a few times after Dark's arrest, but Q.W. did not respond.

Two days prior to Dark's arrest, Q.W. had spoken with Spencer and told him he learned that HOG's sole signee, "D.J.", was about to be cut from his football team. Spencer reassured him that things were fine and said he was about to sign someone else. Again, Q.W. did not have contact with Spencer after Dark's arrest. Frazier called Q.W. on Dark's behalf in July or August 2019 to apologize.

When Spencer was contacted by IRS agents during the course of this investigation, Spencer told agents that Q.W. gave him the money from HOG to start a night club. However, Q.W. asserts that he never told Spencer to use the money he transferred to the HOG account for a night club and was explicit that his intention for the money was that it be used to launch HOG, the sports agency.

6

According to Q.W., Spencer and Dark did not have an official salary that was discussed, but that HOG was used to fund any business expenses they might have. Q.W. did not know that Frazier had sole signatory authority on the HOG bank account.

In July 2019, Frazier used a portion of Victim Q.W.'s money to purchase property in Atlanta, Georgia, wiring the funds from the Head of Game account to the seller to effectuate the purchase. Frazier then sold the property, initiating a wire transfer on August 27, 2019, for the proceeds from that sale, not into the Head of Game account, but instead into the Frazier Investments account.

On January 14, 2019, Charleen Porter opened a bank account at Iberia bank for "Mom & Son's Towing." On January 16, 2019, Anthony Frazier wired $214,825 of Q.W.'s money to that Mom & Son's bank account. Victim Q.W. did not authorize this transfer or even know that it had taken place. According to the Alabama Secretary of State's website, Porter is the registered agent, director, and incorporator of Mom & Son's Towing. Over the next year, Porter made withdrawals on behalf of herself and Spencer, and used the account to pay for personal expenses. These withdrawals were not consistent with regular payroll or legitimate business expenses. Having depleted the majority of the funds in the Iberia account by May 2020, Porter closed the Iberia account and used the

remaining $27,000 in the account to open a new business bank account for Mom & Son's Towing at Cadence Bank on May 5, 2020. Porter and Spencer jointly held the account and were both signatory authorities for the account.

On June 17, 2020, Spencer[1] caused a loan application to be submitted to Kabbage, Inc. under the Paycheck Protection Program (a federal program providing relief for businesses impacted by the COVID-19 pandemic) for Mom and Son's Towing, making certain representations regarding the business and its expenses. Kabbage, Inc., is a lender who works with the Small Business Administration to finance loans generated under the PPP. In the application, Porter was listed as the 100% owner and CEO of Mom and Son's Towing. Spencer further claimed that the loan would be utilized the fund payroll, pay utilities, and pay the lease and mortgage interest for the business. Spencer listed monthly payroll of $34,472 and claimed that Mom & Son's had five employees.

As supporting documentation for his loan application, Spencer submitted a copy of a 2019 Schedule C. Spencer was listed as the sole proprietor on the copy of the Schedule C, which reported gross receipts on line 1 of $866,412, and wages on line 26 of $396,000. Spencer also attached a copy of a Form W3 (Transmittal of

---

1 Although the application purported to have Porter's signature on it, Spencer has recently admitted that he forged her signature on the paperwork and submitted the application himself.

Wage and Tax Statements) as supporting documentation to support the claims of monthly wages reported on the application. The wages listed on line 1 of that Form W3 were $396,000. Spencer submitted Porter's driver's license and a copy of a voided check for the Mom & Son's Towing business account to serve as Porter's identification as the borrower. As discussed above, an applicant is required to initial certain certifications on the application regarding the veracity of the information contained therein, and the initials "CP" were signed on those certifications in the application. As a result of the statements provided on the loan application, Mom & Son's Towing received a loan disbursement in the amount of $86,178.

Spencer's representations on the business' loan application are not supported by bank records. The gross deposits into the business bank account for 2019 were approximately $244,338.98. Of that amount, $214,825 represented Victim Q.W.'s money that Frazier wired from the HOG bank account, on which Frazier was the sole signatory. This is far less than the gross receipts amount claimed on Spencer's loan application. Furthermore, the total withdrawals from the business bank account in 2019 were approximately $230,443.67. However, in the loan application, Spencer claimed to have paid out wages of $396,000, a number far greater than the total withdrawals for the account in that year. Other

inconsistencies were also identified. For example, the inconsistent patterns of credits made it impossible to identify monthly payroll. Spencer sporadically received $33,000 over the course of 2019 from the business checking account; Porter made $87,202.94 of counter withdrawals. None of the payments out of the account resembled regular monthly payroll payments. The majority of the remaining withdrawals were spent on personal living expenses such as various retail purchases, grocery purchases, ATM withdrawals, and car expenses.

On June 19, 2020, Kabbage, Inc. disbursed a loan payment of $86,178, which was wired to the Cadence bank account for Mom & Son's Towing, jointly held by Spencer and Porter. This loan was subsequently used to pay for Spencer and Porter's personal expenses, and not for the purposes designated on their loan application.

On June 22, 2020, Spencer opened a new business bank account for Direct Playa, Inc., and on that same day, caused $5,000 to be wired from the Cadence Mom and Son's account to the Direct Playa, Inc. account, for which he was the sole signatory authority. Two days later, on June 24, 2020, Spencer filed a PPP loan application with Kabbage, Inc. for Direct Playa's purported business. As part of his application, he submitted supporting tax documentation, including a Schedule C and Form W3 reporting gross receipts of $704,765, and wages paid out

10

in the amount of $315,000 for tax year 2019. There were no deposits or withdrawals in the business bank account in 2019, which did not exist until two days before the application was filed. Spencer initialed and signed the paperwork for the loan application in the same way as discussed with the prior loan and attached a copy of his driver's license and a voided check for Direct Playa's bank account as his identification. As a result of Spencer's fraudulent representations, Kabbage, Inc. paid out a loan disbursement of $78,248.

In addition to the above criminal activity, Frazier filed false tax returns for tax years 2017, 2018, and 2019. These returns materially understated Frazier's total income for these years, resulting in a lower tax due and owing than would otherwise have been generated. Specifically, Frazier failed to report the fraud and money laundering proceeds from the activities described above on his tax returns, as is required by law.

## II.   <u>Summary of Offenses</u>[2]

### A.  *Money Laundering*

Counts One through Twenty-Three charge Defendant Frazier with money

---

2  Of note, there are five counts charged in the Indictment that will not be before the jury at trial. Frederick Spencer has indicated his intention to plead guilty to Counts 30, 33, and 34 on February 12, 2024, and Charleen Spencer has entered a pre-trial diversion agreement as to Counts 30, 31, and 32. Although the Government will offer evidence of those offenses at trial as part of its case-in-chief as to Count 28, the Government will not summarize them here.

laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and (a)(1)(B)(ii). The Government must prove (1) the Defendant knowingly conducted or tried to conduct financial transactions; (2) the Defendant knew that the money or property involved in the transaction were the proceeds of some kind of unlawful activity; (3) money or property did come from an unlawful activity, specifically distribution and possession with intent to distribute controlled substances, and attempt and conspiracy to do the same; and (4) the Defendant knew that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds, or

(4) the Defendant participated in the transaction to avoid a transaction-reporting requirement under state or Federal law.

Specifically, Defendant Frazier is charged with two separate theories of money laundering—first, that he made cash deposits and obtained postal money orders for purported automobile sales that did not occur, and placed those proceeds into business bank accounts, all the while knowing that the money was in fact proceeds of drug trafficking. Second, Defendant Frazier is charged with making these deposits in an attempt to avoid reporting requirements—in other words, laundering the money such that it avoided detection.

Defendant Frazier is also charged with money laundering under 18 U.S.C. §

1957 in Count 29, which alleges that he took money he received from Q.W. for purposes of starting a sports agency, and instead used it to purchase property and then caused funds from the sale of that property to be deposited into his own bank account for his own personal use.

### B. Structuring

Counts Twenty-Four through Twenty-Seven charge Defendant Frazier with money laundering, in violation of Title 31, United States Code, Sections 5324(a)(3) and (d)(2). There two separate reporting requirements at issue in these charges—the $10,000 threshold amount for domestic financial institutions such as banks, and the $3,000 threshold amount for postal money orders. Frazier is charged with structuring to evade both, as the evidence will show that he traveled to banks and post offices around the Talladega/Lincoln area, often within days of each other, depositing amounts less than $10,000 in an effort to avoid generating a report.

### C. Conspiracy to Commit Wire Fraud

Count Twenty-Eight of the Superseding Indictment charges both Defendants with conspiracy to commit wire fraud. The Government must prove 1) a conspiracy to commit the offense 2) knowledge of the conspiracy; and 3) that Defendant knowingly joined the conspiracy. United States v. Feldman, 931 F.3d 1245, 1257 (11th Cir. 2019) (citing United States v. Gonzalez, 834 F.3d 1206, 1220 (11th Cir.

13

2016)). There is no overt act requirement in a conspiracy charged pursuant to 18

U.S.C. § 1349. Id. at 1258. Specifically, the Government alleges that the Defendants

joined in a conspiracy to defraud Q.W. by inducing him to wire $500,000 to an

account held by Frazier, claiming that they would start a sports agency on his behalf.

In fact, Frazier and Spencer used these funds to personally enrich themselves in

several ways. Frazier used the funds to "flush out" his drug proceeds and legitimize

his businesses, to pay down credit card debt, and for various other personal items.

Spencer used the funds for personal items and to substantiate business bank accounts

for the purpose of soliciting PPP loans for those businesses. Spencer ultimately

obtained over $150,000 in PPP loans for purported businesses, whose only major

source of income or deposits were money stolen from Q.W.

   *D. Tax Fraud*

   Finally, Defendant Frazier is charged with three counts of 26 U.S.C. §

7206(1), Filing a False Tax Return. The Government must prove that 1) the

Defendant made or caused to be made a tax return for the years charged, 2) the

returns were filed under penalty of perjury, 3) that when the Defendant made the

false return, he knew it contained false material information, and 4) when he did so,

he intentionally violated a known legal duty. Specifically, Frazier underreported his

income for the years charged in the Indictment, in that he failed to report the

14

proceeds of his drug trafficking and the proceeds of money received from Q.W. Because he failed to report his income, his tax due and owing was substantially lower than it otherwise would have been, resulting in a materially false return.

### III.   **Proof of Conduct**

#### A.  *Money Laundering Evidence of Specified Unlawful Activity*

As further discussed in the Government's Rule 404(b) notice, the Government intends to use evidence of Defendant Frazier's prior drug trafficking conviction in 2020 as part of its case-in-chief to prove the requisite specified unlawful activity for the charged money laundering counts. This conduct is contemporaneous with the charged money laundering activity and is intrinsic to the government's case. The Government will also offer testimony regarding undercover and surveillance operations contemporaneous with the events in the Indictment to demonstrate Frazier's movements and operations in the drug trafficking and money laundering world.

#### B.  *Defendant's Prior Statements*

The Government intends to offer prior statements by Defendant Spencer as to the intended use for the money he obtained from Q.W. Specifically, in a consensual interview with IRS agent Lisa Fontanette, Spencer stated that Q.W. had given him the money to purchase a night club in Atlanta. The Government expects that Q.W.

15

and the records introduced will directly refute this claim, and that Spencer's untruthful statements to law enforcement about the purpose for the wire transfer are evidence of his guilt.

### C. IRS Records and Witnesses

The Government will introduce a number of relevant IRS records, including tax returns and transcripts, as self-authenticating certified copies of public records, pursuant to Federal Rule of Evidence 902. While these documents are self-authenticating, the Government will use an IRS Service Center witness to briefly explain the contents of the records to the jury. The Service Center witness will primarily speak to the maintenance of records and explain the mechanics of different documents introduced, and will not be providing expert testimony. These documents are also admissible as exceptions to hearsay under FRE 803(6), (8), and (10). The Government will redact these returns in compliance with Court requirements and privacy laws prior to publishing at trial, and, subject to instruction otherwise from the Court, will only provide a redacted copy of records for the jury to review during its deliberation.

The Government also intends to call a Revenue Agent from the Internal Revenue Service to explain the tax implications of the returns used and filed in the scheme. It is the Government's position that this testimony does not qualify as expert

16

testimony under the Rules of Evidence, however, the Government provided notice to opposing counsel on February 5, 2024 of its intention to call this witness out of an abundance of caution.

### D. Bank Records

The Government will introduce a number of bank records related to the conspiracy in this case, to show how fraudulent tax refunds were deposited and withdrawn for the benefit of the Defendants. These documents will be introduced pursuant to Federal Rule of Evidence 902 as self-authenticating business records, as they will be introduced with their respective 902(11) certifications. Because these records are voluminous, and primarily introduced in their entirety for the purpose of summarizing the scope of the conspiracy, the Government is unable to fully redact all records it seeks to admit. The Government will certainly redact any pages that it seeks to publish, but requests that the Court allow for the admission of the remainder of the records unredacted and under seal. It is further the Government's understanding that in addition to their independent admissibility under FRE 902, the exhibits and their admission will also be stipulated to by both Defendants.

### E. Summary Witnesses

To assist the jury's examination of the bank records and postal money orders with respect to the charged money laundering and structuring counts in this case, the

17

Government intends to present summary witness testimony in its case-in-chief through ATF Investigator Jonathan Esworthy. Investigator Esworthy has examined the underlying bank records, postal money orders, car sales documentation, and other relevant documents in this case and is prepared to summarize what they contain to the jury. Although all of the underlying records and reports will be submitted into evidence, Investigator Esworthy's synopsis of their contents will serve as an aid to explain and process voluminous evidence.

In addition, to assist the jury's examination of the false items on the Defendant's tax returns, and the tax consequences of those false items, the Government intends to present summary witness testimony in its case-in-chief through IRS Special Agent Dylan Owens.

Summary witness testimony is routinely admitted in tax prosecutions. See United States v. Barnette, 800 F.2d 1558 (11th Cir. 1986) (superseded by statute on other grounds). Here, Agent Owens will listen to the testimony of the relevant tax witnesses and summarize how Defendant Frazier falsified his returns in light of all of the other charged criminal conduct, including money laundering, structuring, and wire fraud. He will further summarize voluminous bank records, pursuant to Federal Rule of Evidence 1006. The Government does not believe that this testimony requires Agent Owens to be qualified as an expert.

18

As is standard practice in federal tax prosecutions, the Government will request that Agent Owens be permitted to remain in the courtroom throughout the presentation of evidence. Agent Owens is a person whose presence is essential to the presentation of the Government's case. Indeed, his role as a summary witness is to know and summarize the evidence, as well as summarize his investigation and the information it revealed. As a result, the Government requests that the summary witness (and case agent) be exempted from any Rule 615 request to exclude witnesses from the courtroom. See, e.g., United States v. Moore, 997 F.2d 55, 58 (5th Cir. 1993).

### F.  Summary Evidence/Demonstratives

The use of summary evidence is governed by Federal Rule of Evidence 1006, which is interpreted broadly. The Rule allows admission of summaries when the admitted evidence is voluminous, and review by the jury would be inconvenient. FRE 1006 requires that the summarized evidence is voluminous, admissible, and available for inspection. United States v. Daniels, 986 F.2d 451 (11th Cir. 1993).

As an aid to the jury, Agent Owens, Investigator Esworthy, and IRS Revenue Agent Rolanda Rooney will make use of summary charts, based upon admitted evidence. The summary schedules, because they will reflect only evidence that is admitted or admissible at trial, by necessity will not be finalized until shortly before

19

their testimony. As such, final copies of their summary schedules will be provided to the Defendant shortly before their testimony. However, draft summaries and demonstratives have been prepared based on the anticipated admission of certain underlying records, and those drafts have been provided to the defense.

The Government intends to use, in closing argument and during the testimony of its summary witness, visual aids to help explain its case to the jury, based upon the admitted evidence. Federal Rule of Evidence 611(a), which gives the trial court control over the mode of presenting evidence, also pertains to visual aids. Visual aids are typically used as pedagogical devices either to simplify complex evidence or to assist counsel in the presentation of argument to the jury. These will be provided to the defense for inspection prior to trial.

Rule 611(a) and Rule 1006 are not mutually exclusive. For instance, a chart originally offered as a pedagogical device under Rule 611(a) could alternatively be admitted into evidence if it accurately summarizes the underlying documents and the court concludes that the underlying documents are too voluminous to be examined conveniently in court. See United States v. Milkiewicz, 470 F.3d 390, 396-97 (1st Cir. 2006). Despite the potential for overlap between the two types of visual aids, the differences are important. A Rule 611(a) visual aid must be based on admitted evidence but is generally not admitted into evidence itself. But see

Milkiewicz, 470 F.3d at 398 (noting that Rule 611(a) visual aids may be admissible). Furthermore, a Rule 1006 Summary chart must "fairly represent the underlying documents and be accurate and non prejudicial" while a Rule 611(a) pedagogical device may be less neutral and may reflect the inferences and conclusions of the party offering the summary. *See id.* at 398 (internal quotation marks omitted). Regardless of whether a visual aid is admitted into evidence under Rule 1006 or used as a pedagogical device under Rule 611(a), a cautionary jury instruction may be appropriate.

Here, the Government intends to make use of several demonstratives during the testimony of its summary witnesses and also during its closing arguments. However, the Government will be explicit as to which of these exhibits are demonstratives and will not offer them for admission, merely for publication as an aid to the jury.

### *Stipulations*

Based on conversations with defense, it is the Government's understanding that there will be several stipulations regarding the admissibility of business and bank records. These signed stipulations will be provided to the Court at the pre-trial conference, and will be read into the record during trial at a time and in a manner that the Court deems appropriate.

*Rebuttal Witnesses*

Defense counsel has relayed that they may have defense exhibits or witnesses as part of their case. In light of this information, the Government may call witnesses on rebuttal to counter defense claims or theories. The Government will provide any rebuttal information to the defense as expeditiously as possible once the need for it is identified.

### IV.   **Other Trial Issues**

Chain of Custody

To avoid unnecessary delay and reduce the number of chain of custody witnesses, the United States does not anticipate calling every witness included in the chain of custody with each item of evidence.   The witnesses who will testify in the Government's case-in-chief regarding the recovery of evidence will be able to testify as to the chain of custody.   The United States would note, however, that any breaks in the chain of custody merely go to the weight of the evidence rather than to its admissibility.   *See United States v. Roberson*, 897 F.2d 1092 (11th Cir. 1990) and *United States v. Lopez*, 758 F.2d 1517, 1521 (11th Cir.1985), *cert. denied*, 474 U.S. 1054, 106 S.Ct. 789 (1986).

22

Witnesses

The government has provided the Court and opposing counsel with an anticipated witness list under separate cover.

Exhibit List

The government has provided the Court and opposing counsel with a list of proposed exhibits under separate cover.

Post-Verdict Forfeiture Proceeding

Should the fact-finder find the Defendant guilty on any indictment count for which forfeiture is sought, the Court must determine what property is subject to forfeiture. Fed. R. Crim. P. 32.2(b)(1)(A). If forfeiture is contested by either party, the Court must conduct a hearing as soon as practical following the verdict. Fed. R. Crim. P. 32.2(b)(1)(B). In a case tried before a jury, the court should ascertain, before the jury begins deliberating, whether either party will request that the jury be retained to determine forfeitability of property at the forfeiture hearing. Fed. R. Crim. P. 32.2(b)(5)(A). In such a hearing, the Defendant may not re-litigate his guilt, as the only question in such a proceeding is the nexus between the property and the offense. *United States v. Warshak*, 631 F.3d 266, 331 (6th Cir. 2010). The Court can make its determination based on evidence already in the record or on additional evidence submitted by the parties. Fed. R. Crim. P. 32.2(b)(1)(B).

23

Because forfeiture is an aspect of sentencing, the United States need only prove the elements of forfeiture by a preponderance of the evidence. *United States v. Hasson*, 333 F.3d 1264, 1277 (11th Cir. 2003). Furthermore, the Federal Rules of Evidence do not apply in forfeiture proceedings. Fed. R. Evid. 1101(d)(3); *United States v. Smith*, 770 F.3d 628, 641 (7th Cir. 2014).

## V.    <u>Conclusion</u>

The foregoing is a summary of points the Government expects may arise at trial. If any legal issues arise that have not been covered in this memorandum, the Government respectfully requests permission to file a supplemental memorandum of law, or to otherwise make argument as the issues arise in trial.

Respectfully submitted this 9th day of February, 2024.

Respectfully submitted,

PRIM F. ESCALONA
United States Attorney

/s/   *Allison J. Garnett*
ALLISON J. GARNETT
Assistant United States Attorney

/s/   *M. Blake Milner*
M. BLAKE MILNER
Assistant United States Attorney

24

/s/   *Austin D. Shutt*
AUSTIN D. SHUTT
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that, on February 9, 2024, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause a copy to be served on all counsel of record.

/s/   *Allison J. Garnett*
ALLISON J. GARNETT
Assistant United States Attorney

ADDRESS OF COUNSEL:

United States Attorney's Office
1801 Fourth Avenue North
Birmingham, AL 35203
Telephone:   (205) 244-2001
Fax:             (205) 244-2182
Email:          Allison.Garnett@usdoj.gov

26